SID DILLON CHEVROLET-OLDSMOBILE-PONTIAC, INC., ET AL.,
APPELLEES, V. MORTON SULLIVAN ET AL., APPELLANTS.
559 N.W.2d 740

Filed February 7, 1997.    No. S-94-1176.

Michael M. O'Brien, of Cannon, Goodman, O'Brien & Grant, P.C., for appellants.

J. Joseph McQuillan, of Walentine, O'Toole, McQuillan & Gordon, for appellees.

WHITE, C.J., CAPORALE, FAHRNBRUCH, LANPHIER, WRIGHT, CONNOLLY, and GERRARD, JJ.

GERRARD, J.
The district court found appellant Morton Sullivan and his businesses to be in contempt of court in regard to Sullivan's

repeated violations of a temporary restraining order prohibiting him from uttering any word concerning appellees Sid Dillon and his businesses. Although Sullivan's and Dillon's businesses are named as parties to this action, we will refer to the appellants as Sullivan and the appellees as Dillon, since the focus of this opinion is on these individuals. Further, the district court substituted a permanent injunction for its temporary restraining order in regard to Sullivan's conduct and speech directed toward Dillon which it deemed violative of the Uniform Deceptive Trade Practices Act, Neb. Rev. Stat. § 87-301 et seq. (Reissue 1994), and assessed attorney fees against Sullivan. It is from these orders that Sullivan appeals.

We affirm the district court order finding Sullivan in contempt of court and the court's award of attorney fees in this regard. However, we conclude that the district court erred when it entered the temporary restraining order enjoining Sullivan's speech pursuant to the Uniform Deceptive Trade Practices Act. We likewise conclude the district court erred when it entered the permanent injunction further restraining Sullivan's speech and in awarding Dillon attorney fees in this regard.

## ASSIGNMENTS OF ERROR

Sullivan assigns that the district court erred as follows: (1) by finding him in violation of the Uniform Deceptive Trade Practices Act, (2) in granting a permanent injunction in violation of Sullivan's First Amendment rights, (3) by finding him in contempt of court and imposing a civil penalty for his alleged violations of the temporary restraining order, and (4) in awarding Dillon reasonable attorney fees.

## STANDARD OF REVIEW

An action for injunction sounds in equity. *Latenser v. Intercessors of the Lamb, Inc.*, 250 Neb. 789, 553 N.W.2d 458 (1996); *Ben Simon's, Inc. v. Lincoln Joint-Venture*, 248 Neb. 465, 535 N.W.2d 712 (1995). In an appeal from an equitable action, a reviewing court reviews the action de novo on the record and reaches a conclusion independent of the factual findings of the lower court, subject to the rule that where credible evidence is in conflict on material issues of fact, the reviewing

court may consider and give weight to the fact that the trial court observed the witnesses and accepted one version of the facts over another. *Engelhaupt v. Village of Butte*, 248 Neb. 827, 539 N.W.2d 430 (1995).

## FACTUAL BACKGROUND

Sullivan owns and operates various advertising and information businesses in the Omaha area. Dillon owns and operates three General Motors automobile dealerships in Nebraska: two in Fremont and one in Blair.

On October 5, 1990, Sullivan took possession of a new 1990 Chevrolet Suburban from Vinton Motors in Blair. Sullivan obtained this vehicle as part of a negotiated settlement between General Motors and himself in regard to Sullivan's claim that the 1989 Suburban he purchased from a Lincoln Chevrolet dealership was a "total lemon." In addition, Sullivan received a General Motors extended protection plan warranty. Sullivan had his new Suburban serviced at Vinton Motors on more than one occasion. A receipt indicates that on July 2, 1991, Vinton Motors repaired the Suburban's front brakes. On August 1, Dillon entered into an agreement to purchase the assets of Vinton Motors and some time later began to operate the Blair General Motors dealership under his name.

On September 13, while in Fremont, Sullivan's Suburban quit running. Sullivan elected to have his vehicle towed to Dillon's Fremont Chevrolet dealership for repairs. It was discovered that an electrical junction box had shorted-out, causing the vehicle to stall. The service manager for the dealership testified that he thought the short was caused by the improper installation of "after-market" electronic equipment. The junction box was replaced, and, in addition, Dillon's changed the oil, and rotated and balanced the tires. The service manager testified that when Sullivan picked up his vehicle, Sullivan did not ask whether the repair was covered by either the standard General Motors new car warranty or Sullivan's separate extended protection plan warranty. Sullivan disputes this testimony and claims that he inquired as to whether the repair was covered by one of his warranties and was told that it was not. However, Sullivan was unable to recall which Dillon's

employee specifically told him the repair was not a covered item.

Sullivan continued to experience problems with his brakes, and on December 4, he presented his Suburban to Dillon's dealership in Blair for further repairs. The invoice from this repair indicates many of the same items previously repaired by Vinton Motors in July needed to be fixed again. Dillon did not charge Sullivan for this repair work but did charge Sullivan $67.49 for other service unrelated to the brake repairs. Sullivan paid for the service with a check, but said when he drove away that he immediately knew the brake problem had not been ameliorated. Sullivan returned to the Blair dealership the next day and complained to the service manager. Sullivan said the service manager refused to make further repairs. In response, Sullivan stopped payment on his check.

Dillon testified that sometime in January 1992, Sullivan came into his Fremont dealership and asked to see him. Dillon asked his son, Sid Dillon, Jr., to sit in on this meeting. Dillon, Sr., said Sullivan presented him with a pile of papers, some of which appeared to be General Motors repair invoices, and asked Dillon what he was going to do about that "stack of papers." Dillon said that he told Sullivan there was nothing he was going to do about them and that he did not want to do business with Sullivan any longer.

Not surprisingly, Sullivan's recollection of this meeting is different. Sullivan claims he went to see Dillon to apologize for stopping payment on the check and to give Dillon a cashier's check for the amount in question. Sullivan said he intended to tell Dillon he wanted to do business with him and inquire as to whether Dillon would honor the General Motors warranties on his Suburban. However, Sullivan claimed Dillon pointed his finger at him and started shouting that he knew of Sullivan's past practices, that under no circumstances would he honor any warranties on Sullivan's vehicle, and that he never wanted to see Sullivan's vehicle in any of his dealerships again.

In February 1992, Sullivan telephoned and faxed employees of the General Motors Protection Plan in Michigan, inquiring as to whether any of the repairs performed by Dillon should have been covered under his extended warranty plan. In a letter,

Thomas England, claims supervisor for General Motors Insurance Corporation, responded that $60.52 of the repair in regard to the electrical junction box was covered and offered to reimburse Sullivan that amount. However, England testified that at the time he wrote the letter to Sullivan, he was unaware of the fact that the installation of after-market electronic equipment was thought to be the cause of the junction box failure. England said that had he been informed of this fact, he would have told Sullivan the repair was not covered by his warranties. Furthermore, John Rahie, a General Motors staff attorney, and the supervisor of customer assistance both testified that they discussed England's letter with Sullivan and told him that England was wrong and that the repair at issue was not covered under either warranty because it was caused by the installation of after-market equipment.

In March, Sullivan sent a letter to Dillon in which he demanded that Dillon replace his 1990 Suburban with a new 1992 Suburban and an extended warranty plan. This demand was accompanied with the threat that if Dillon did not comply, Sullivan would become Dillon's "WORST NIGHTMARE" by informing everyone that Dillon was a dishonest dealer because he charged customers for warranty repairs and would not honor General Motors warranties. Sullivan's expressed goal was to put Dillon out of business. Toward this end, Sullivan began a campaign where, utilizing the mass mailing and communication capabilities of his businesses, he flooded the media with purported news releases concerning dishonest General Motors dealers, operated automatic telephone dialing equipment in order to provide the general public with "community service announcements" concerning Dillon, and faxed letters to local General Motors dealers detailing his side of the dispute with Dillon. The gist of Sullivan's several "announcements" and communications was that Dillon is a dishonest automobile dealer.

In addition, Sullivan has faxed or telephoned, in regard to his complaints, the former chairmen of General Motors, Robert Stempel and Roger Smith, General Motors' current chairman, Jack Smith, and General Motors' current corporate counsel. He has conducted mass mailings and telephoned neighbors of

General Motors' staff attorney Rahie in a successful attempt to obtain Rahie's home telephone number and then called Rahie's home and spoke to his children. Sullivan has also filed complaints against Rahie with the Michigan Bar Association and against Dillon's counsel with the Nebraska Bar Association.

On June 8, 1992, Dillon filed a verified petition in equity, seeking damages and injunctive relief in regard to two theories of recovery: the first, pursuant to the Uniform Deceptive Trade Practices Act, § 87-301 et seq., claiming that in the course of his business, Sullivan has disparaged the goods, services, or business of Dillon by false or misleading representations of fact, and the second pursuant to common-law libel and slander. That same day, the district court granted Dillon a temporary restraining order but did not specify which theory of recovery it relied on. The order provided that Sullivan was enjoined

> from uttering *any word, written or oral*, or engaging the automatic dialing-announcing device in any fashion, directed at the Plaintiffs, their agents or employees, or taking other steps or action which may reasonably lead or result in damage to the Plaintiffs' business in Blair, Nebraska, or surrounding communities.

(Emphasis supplied.)

Sullivan filed a motion to dissolve the temporary restraining order on June 15, 1992. After a hearing (the record of which is not included in the record before this court), the district court issued an order on August 18 denying Sullivan's motion. The court specifically found that Dillon was due injunctive relief with respect to his claim pursuant to the Uniform Deceptive Trade Practices Act. The court did not address whether Dillon was due injunctive relief pursuant to his common-law libel and slander theory of recovery.

The record indicates that Sullivan has violated the temporary restraining order on more than one occasion.

On November 10, 1994, in separate but contemporaneously issued orders, the district court found Sullivan to be in contempt of court, fined him $25,000 for his repeated violations of the temporary restraining order, and found Sullivan's conduct to be in violation of the Uniform Deceptive Trade Practices Act. In addition, the court vacated the temporary restraining order and

replaced it with a permanent injunction which provided that Sullivan and his agents and employees

> are permanently enjoined from uttering any false or misleading statements of fact, written or oral, or engaging in any automatic dialing-announcing device with the purpose of communicating any false or misleading statements of fact, directed at Plaintiffs, their principals, agents, attorneys or employees, or taking other steps or actions which may reasonably lead or result in the disparaging of the goods, services, or business of Plaintiffs.

The trial judge provided Sullivan with the opportunity to purge his contempt fine if he did not violate the permanent restraining order between the date of the order, November 10, 1994, and November 15, 1995. In addition, the court awarded attorney fees to Dillon's attorney, $5,000 in regard to the hearing on the permanent injunction and $1,000 in regard to the issue of contempt of court. At the time of argument before this court, both parties agreed that Sullivan has complied with the permanent injunction and purged the contempt fine.

## ANALYSIS

Sullivan has been before this court on a prior occasion concerning the same sort of conduct and speech which is at issue in the instant appeal. In *J.Q. Office Equip. v. Sullivan*, 230 Neb. 397, 432 N.W.2d 211 (1988), Sullivan experienced numerous difficulties with his copier. After the warranty period for the copier expired, Sullivan, still dissatisfied, demanded further service and supplies at no cost. Eventually, the plaintiff's service technician informed Sullivan that the drum of the copier was damaged and needed to be replaced. Sullivan believed that the damage was caused by a service technician on a prior occasion and requested that the plaintiff replace the drum at its expense. When the plaintiff refused, Sullivan threatened to publicize through the use of his automatic telephone-dialing equipment his belief that the plaintiff's copiers and service were substandard. Some time later, the plaintiff learned that Sullivan planned to attend an exhibitors' show for office equipment and along with 15 friends, each with a bullhorn, surround the plaintiff's booth and broadcast Sullivan's complaint concerning the plain-

tiff and its copiers. The plaintiff then sought and obtained an injunction barring Sullivan's demonstration.

This court held that the injunction issued barring Sullivan's conduct constituted an unconstitutional prior restraint in violation of Sullivan's First Amendment right of free speech. We recited that prior restraints are not per se unconstitutional, but that there was a heavy burden against a prior restraint's constitutional validity. As a general rule, a prior restraint must fit within one of the narrowly defined categories to pass constitutional muster. Further, we specifically rejected the argument that Sullivan's speech was commercial speech and therefore deserving of lesser First Amendment protection. Instead, we concluded that Sullivan was expressing his opinion with coercive speech and that both opinion and coercive speech are just the sort of communications protected by the First Amendment.

For the purposes of the instant appeal, we note that an injunction is an extraordinary remedy and should not ordinarily be granted except in a clear case where there is actual and substantial injury. Such a remedy should not be granted unless the right is clear, the damage is irreparable, and the remedy at law is inadequate to prevent a failure of justice. *Ben Simon's, Inc. v. Lincoln Joint-Venture*, 248 Neb. 465, 535 N.W.2d 712 (1995); *Nebraska Irrigation, Inc. v. Koch*, 246 Neb. 856, 523 N.W.2d 676 (1994).

Dillon argues that the instant case is different from Sullivan's previous appearance before this court. In the case at bar, Dillon complains that Sullivan's speech contains false and misleading representations of fact and, as such, is unprotected by the First Amendment. Further, Dillon argues he is due injunctive relief in regard to Sullivan's speech because of the operation of the Uniform Deceptive Trade Practices Act, § 87-301 et seq.

In pertinent part, § 87-303(a) provides: "A person likely to be damaged by a deceptive trade practice of another may be granted an injunction against it under the principles of equity and on terms that the court considers reasonable. Proof of monetary damage, loss of profits, or intent to deceive is not required." Section 87-302(a) provides: "A person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation, he or she: . . . (8) Disparages the

goods, services, or business of another by false or misleading representation of fact . . . ."

We disagree with Dillon's contentions in at least two respects. First, it is axiomatic that the provisions of the Uniform Deceptive Trade Practices Act cannot abrogate Sullivan's free speech rights under the First Amendment to the U.S. Constitution or article I, § 5, of the Nebraska Constitution.

Further, by its own terms, § 87-303(a) only provides for equitable relief consistent with general principles of equity. As a general rule, equity will not enjoin a libel or slander. "One of the unwavering precepts of the American law of remedies has long been the axiom that equity will not enjoin a libel." Rodney A. Smolla, Law of Defamation § 9.13(1)(a) at 9-36 (1996). See, also, *Kramer v. Thompson*, 947 F.2d 666 (3d Cir. 1991); *Lothschuetz v. Carpenter*, 898 F.2d 1200 (6th Cir. 1990); *Matter of Providence Journal Co.*, 820 F.2d 1342 (1st Cir. 1986), *modified on other grounds* 820 F.2d 1354 (1987); *Community for Creative Non-Violence v. Pierce*, 814 F.2d 663 (D.C. Cir. 1987); *Alberti v. Cruise*, 383 F.2d 268 (4th Cir. 1967); *Konigsberg v. Time, Inc.*, 288 F. Supp. 989 (S.D.N.Y. 1968); *N. W. Pac. R. R. Co. v. Lumber & S. W. Union*, 31 Cal. 2d 441, 189 P.2d 277 (1948); *Moore v. City Dry Cleaners & Laundry*, 41 So. 2d 865 (Fla. 1949); *M. Ward & Co. v. United Employees*, 400 Ill. 38, 79 N.E.2d 46 (1948); *Greenberg v. De Salvo*, 254 La. 1019, 229 So. 2d 83 (1969); *Prucha v. Weiss*, 233 Md. 479, 197 A.2d 253 (1964), *cert. denied* 377 U.S. 992, 84 S. Ct. 1916, 12 L. Ed. 2d 1045; *Mescalero Apache Tribe v. Allen*, 81 N.M. 561, 469 P.2d 710 (1970); *Horne v. Radiological Health Services, P.C.*, 83 Misc. 2d 446, 371 N.Y.S.2d 948 (1975), *aff'd* 51 A.D.2d 544, 379 N.Y.S.2d 374 (1976); *Wolf v. Gold*, 9 A.D.2d 257, 193 N.Y.S.2d 36 (1959); *Schmoldt v. Oakley*, 390 P.2d 882 (Okla. 1964); *Willing v. Mazzocone*, 482 Pa. 377, 393 A.2d 1155 (1978); *Lawrence v. Atwood*, 295 S.W.2d 298 (Tex. Civ. App. 1956); *Kwass v. Kersey*, 139 W.V. 497, 81 S.E.2d 237 (1954).

Among the rationales traditionally advanced to support the proposition that equity will not enjoin a libel are that damages provide an adequate remedy at law, the defendant would be deprived of the right to a jury trial concerning the truth of his or her allegedly defamatory publication, and to enjoin defamation

is to effect an unconstitutional prior restraint on speech. See, *Kramer v. Thompson, supra; Matter of Providence Journal Co., supra; Greenberg v. De Salvo, supra; Mescalero Apache Tribe v. Allen, supra; Willing v. Mazzocone, supra;* Smolla, *supra,* § 9.13(1)(b).

Notwithstanding the general rule, it is also recognized that equity may restrain libel or slander if essential to preserve a property right, if the publication is in violation of a trust or contract, or if the defamation is published in aid of another tort or unlawful act. See, *M. Ward & Co. v. United Employees, supra; Horne v. Radiological Health Services, P.C., supra; Lawrence v. Atwood, supra.*

Some jurisdictions have concluded that an order enjoining further publication of libelous or slanderous material does not constitute a prior restraint on speech where there has been a full and fair adversarial proceeding in which the complained of publications were found to be false or misleading representations of fact prior to the issuance of injunctive relief. See, *Retail Credit v. Russell,* 234 Ga. 765, 218 S.E.2d 54 (1975); *Advanced Training Sys. v. Caswell Equip. Co.,* 352 N.W.2d 1 (Minn. 1984); *O'Brien v. Tenants,* 42 Ohio St. 2d 242, 327 N.E.2d 753 (1975). But see *Kramer v. Thompson, supra.*

Several other state appellate courts have reversed the issuance of injunctive relief in favor of merchants or service providers who were faced with dissatisfied customers' unconventional airing of their grievances. In *Lawrence v. Atwood, supra,* the appellant, dissatisfied with the construction of his home, placed on his property a large sign, visible to two heavily traveled streets, on which he declared his belief that his house, built by the appellee, was a "lemon." The appellee was granted a temporary injunction requiring the appellant to remove his sign. On appeal, the Texas Court of Civil Appeals reversed and dissolved the temporary injunction stating:

> The publication was alleged to be a continuing one, it is true, and it was alleged to be causing irreparable injury to appellee's reputation and business, for which injury, according to a further allegation of the petition, appellee had and has no adequate remedy at law; but these allegations did not alter the basic nature of the act that was

charged to appellant. We are of the opinion, therefore, that the case is governed by the general rule that a court of equity has no jurisdiction to restrain a mere libel or slander, where no breach of trust or of a contract is shown.

*Lawrence v. Atwood*, 295 S.W.2d at 300.

In *Willing v. Mazzocone*, 482 Pa. 377, 393 A.2d 1155 (1978), the appellee was an attorney who at one point secured a workers' compensation disability award for the appellant. At the time of the settlement distribution, the appellee deducted the sum of $150 and paid this money in total to the appellant's treating psychiatrist for his testimony in the workers' compensation proceeding. The appellant, for some unexplained reason, developed the irrational belief that the appellee had diverted $25 of this money to the appellee's own benefit.

To protest her dissatisfaction with the appellee, the appellant began wearing a "sandwich-board" sign which announced her belief that her attorney had stolen money from her and sold her out to the insurance company. The appellant would march back and forth between two court buildings in downtown Philadelphia wearing her "sandwich-board" sign and pushing a shopping cart with an American flag, while continuously ringing a cowbell and blowing a whistle. The appellee sought and received an injunction which in general terms barred the appellant's conduct. On appeal, the Pennsylvania Superior Court modified the injunction to include only the appellant's specific message and conduct complained of by the appellee.

The Pennsylvania Supreme Court reversed the lower court's decision, citing the traditional view that equity lacks the power to enjoin the publication of defamatory matter. The court concluded that even in instances where a damage award would be a pointless gesture because of the tort-feasor's indigency, the remedy for defamation is still an action at law for damages. *Id.*

We adopt the view of those jurisdictions that have considered the issue and hold that absent a prior adversarial determination that the complained of publication is false or a misleading representation of fact, equity will not issue to enjoin a libel or slander, unless such libel or slander is published (1) in violation of a trust or contract or (2) in aid of another tort or unlawful act, or injunctive relief is essential for the preservation of a property right.

In the instant case, although Sullivan's speech and conduct is hardly a model of good citizenship, neither was it published in aid of another tort or unlawful act or in violation of Dillon's property rights, nor does its publication constitute a breach of trust or contract. A jury has yet to determine whether Sullivan's allegations about Dillon and his business practices are false or misleading representations of fact. For these reasons, we conclude that the temporary restraining order, as well as the permanent injunction restraining Sullivan's speech, constitute unconstitutional prior restraints in derogation of Sullivan's right to speak. Thus, Sullivan's conduct and speech do not fall within the ambit of § 87-303(a), and the district court erred by so finding.

Further, the district court awarded Dillon attorney fees pursuant to § 87-303(b), which provides that the "court in its discretion may award attorneys' fees to the prevailing party if . . . (2) the party charged with a deceptive trade practice has willfully engaged in the trade practice knowing it to be deceptive."

Sullivan's deceptive trade practice is his alleged disparagement of Dillon's business through false or misleading representations of fact. However, so as to not effect a prior restraint, Sullivan can only be found to have willfully engaged in a trade practice knowing it to be deceptive subsequent to a full and fair adversarial proceeding before a judicial tribunal and a finding that Sullivan's statements concerning Dillon were false or misleading representations of fact. See *Advanced Training Sys. v. Caswell Equip. Co.*, 352 N.W.2d 1 (Minn. 1984). Since no such prior finding has been made in the instant case, the district court abused its discretion in awarding attorney fees to Dillon in regard to Sullivan's alleged deceptive trade practice.

Even though the district court erred by enjoining Sullivan's speech, it does not follow that Sullivan was free to ignore the temporary restraining order without fear of sanction. The collateral bar rule requires that a party may not, as a general rule, violate a court order and raise the issue of its unconstitutionality collaterally as a defense in a contempt proceeding. The appropriate method to challenge such a court order is to petition to have the order vacated or amended. See, *Walker v. City of Birmingham*, 388 U.S. 307, 87 S. Ct. 1824, 18 L. Ed. 2d 1210

(1967); *Matter of Providence Journal Co.*, 820 F.2d 1342 (1st Cir. 1986), *modified on other grounds* 820 F.2d 1354 (1987).

Two exceptions to this rule are if the court is without jurisdiction over the subject matter or contemnor, then any order entered would be void ab initio and not subject to the collateral bar rule. *Matter of Providence Journal Co., supra.* Also, the Court in *Walker* hinted that the collateral bar rule would not apply "where the injunction was transparently invalid or had only a frivolous pretense to validity." 388 U.S. at 315.

Neither exception applies in the instant case. Here, upon application of Dillon, the district court issued an ex parte order on June 8, 1992, temporarily restraining Sullivan's speech. Sullivan filed a motion to dissolve this temporary restraining order on June 15, and a hearing was held on Sullivan's motion on July 28. In an order dated August 18, the district court denied Sullivan's motion. Sullivan never appealed from this ruling.

Whether an order is final and appealable does not always depend upon whether that order completely disposes of the action. An order affecting a substantial right made during a special proceeding is a final and appealable order. *Currie v. Chief School Bus Serv.*, 250 Neb. 872, 553 N.W.2d 469 (1996). A substantial right is an essential legal right, not a mere technical right. *Id.* A special proceeding includes every civil statutory remedy which is not encompassed in chapter 25 of the Nebraska Revised Statutes. *Jarrett v. Eichler*, 244 Neb. 310, 506 N.W.2d 682 (1993).

The district court grounded its denial of Sullivan's motion to dissolve the temporary restraining order on the fact that, in part, the action was brought and the order was entered under the Uniform Deceptive Trade Practices Act: a statutory civil remedy not encompassed in chapter 25. Further, the temporary restraining order completely prohibited Sullivan from speaking about Dillon; thus, the order clearly affected an essential legal right.

Accordingly, Sullivan was obligated to appeal the district court order denying his motion to dissolve the temporary restraining order. Because Sullivan failed to do so, the district court did not err in finding him in contempt of court and assessing a $25,000 fine for his repeated violations of the temporary

restraining order. The issue of whether this fine exceeded the district court's authority is moot, due to the fact that Sullivan purged the fine by not violating the permanent injunction.

Likewise, the district court did not err in awarding reasonable attorney fees to Dillon with respect to Sullivan's contempt of court violation. Attorney fees may be recovered only when authorized by statute or when a recognized and accepted uniform course of procedure allows recovery of an attorney fee. *In re Interest of Krystal P. et al., ante* p. 320, 557 N.W.2d 26 (1996). In *In re Interest of Krystal P. et al.*, we recently concluded that the award of attorney fees against the contemnor in a civil contempt proceeding is a recognized and accepted uniform course of procedure. Thus, the district court acted within its authority when it awarded Dillon reasonable attorney fees with respect to Sullivan's contempt of court violation.

## CONCLUSION

For the foregoing reasons, we affirm the district court order finding Sullivan in contempt of court and the court's award of attorney fees in this regard. Because we conclude that the district court erred when it entered the permanent injunction enjoining Sullivan's speech pursuant to the Uniform Deceptive Trade Practices Act, we reverse, and remand this matter with directions to vacate the injunction imposed therein. We likewise reverse the award of attorney fees in regard to the imposition of the permanent injunction.

AFFIRMED IN PART, AND IN PART REVERSED
AND REMANDED WITH DIRECTIONS.

LANPHIER, J., dissenting.

I respectfully dissent from the majority opinion.

I agree with the principle of law that an injunction is proper when essential to protect a property interest or when slander is published in aid of another tort.

I would hold that in this matter, the injunction was essential to preserve a property right and that the slander was in aid of another tort. As the majority states, Sullivan's expressed goal was to put Dillon out of business and to become his "worst nightmare," unless Dillon gave Sullivan something to which Sullivan was not legally entitled. That fits the classic definition

of blackmail or extortion. The resulting statements of Sullivan attacked the reputation of Dillon. Reputation is an element of the goodwill of a business to a community. The goodwill of a business is as much an asset as its inventory. When an individual intentionally destroys goodwill with statements as in this case, the business has a right to stop the waste of this asset.

An injunction was the proper measure in this case. See, *M. Ward & Co. v. United Employees*, 400 Ill. 38, 79 N.E.2d 46 (1948); *Horne v. Radiological Health Services, P.C.*, 83 Misc. 2d 446, 371 N.Y.S.2d 948 (1975), *aff'd* 51 A.D.2d 544, 379 N.Y.S.2d 374 (1976); *Lawrence v. Atwood*, 295 S.W.2d 298 (Tex. Civ. App. 1956).

I would affirm the decision of the district court.